IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 9, 2003 Session

**JEREMIAH A. LEAVY v. STATE OF TENNESSEE**

**Direct Appeal from the Tipton County Circuit Court**
**No. 3275B     Joseph H. Walker, Judge**

---

**No. W2001-03031-CCA-R3-PC  - Filed January 8, 2004**

---

A Tipton County jury convicted the Petitioner of first degree murder, felony murder, aggravated robbery, and especially aggravated kidnapping. The trial court merged the two murder convictions and imposed a single life sentence with the possibility of parole. On direct appeal, this Court affirmed the conviction, and the Tennessee Supreme Court denied the Defendant's application for permission to appeal. The Petitioner then sought post-conviction relief in the trial court, alleging that he was denied effective assistance of counsel. Following a hearing, the post-conviction court dismissed the petition. The Petitioner filed a motion to reconsider, which the trial court denied, and the Petitioner appealed. Finding no error, we affirm the trial court's dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Jeannie Kaess, Jackson, Tennessee, for the appellant, Jeremiah A. Leavy.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Walt Freeland, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Factual Background**

Our Court summarized the underlying facts of the Petitioner's case on direct appeal as follows:

> On April 27, 1997, at approximately 11:00 a.m., juvenile defendants Adams and Leavy, along with two adult co-defendants, entered the 71-year-old victim's home. They intended to steal a large amount of money rumored to be kept in the house. After fruitlessly ransacking the residence, they sat down to watch basketball

on television and await the victim's return. Sometime shortly before 2:00 p.m., the victim returned from visiting his convalescent wife in a nursing home.

When the victim entered the kitchen, the four young men ambushed him. The adults bound the victim's hands and feet with coat hangers and duct tape. Then, he was placed in the bathtub, which the perpetrators previously filled with water and kerosene. Before leaving, they covered the victim with various blankets, drapes, and pieces of furniture. The victim died of asphyxia.

The juvenile and adult defendants took twenty dollars from the victim's wallet, a microwave oven, and a kerosene space heater. They left in the victim's car shortly after 2:00 p.m. and spent the afternoon driving around eating snacks purchased with the victim's money. They abandoned the car in a muddy field after getting stuck and hitchhiked back home sometime between 4:00 and 4:30 p.m.

Subsequently, both juvenile defendants gave statements admitting their involvement in the crimes. Authorities took the juveniles into custody on April 28, 1997. The juvenile court entered a detention order on May 1, 1997. On June 3, 1997, the juvenile court conducted the first of two transfer hearings and transferred the juveniles to circuit court on the charges of premeditated first degree murder, felony murder, and aggravated robbery. The juvenile court ordered that both juveniles be held without bond. At a second transfer hearing, conducted July 3, 1997, the juvenile court transferred the juveniles to circuit court on the charge of especially aggravated kidnapping.[1] At the close of the second hearing, the juvenile court again refused to set a bond for defendants. However, at their appearance in circuit court on July 18, 1997, the trial judge set $100,000 bonds for each.

State v. Adams and Leavy, No. W1998-00531-CCA-R3-CD, 1999 WL 1565193, at *1-2 (Tenn. Crim. App., at Jackson, Dec. 21, 1999), *perm. app. denied* (Tenn. July 31, 2000).

A Tipton County jury convicted the Petitioner of first degree murder, felony murder, aggravated robbery, and especially aggravated kidnapping on March 17, 1998. The trial court merged the two murder convictions and imposed a single life sentence with the possibility of parole. This Court affirmed the conviction on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. The Petitioner filed a pro se post-conviction petition. The post-conviction court appointed Jeannie Kaess to represent the Petitioner in this post-conviction matter. Kaess filed an amendment to the Petitioner's original petition for post-conviction relief. In his petition, the Petitioner asserted that he should be granted post-conviction relief based

---

[1] After hearing the proof on June 3, 1997, the state filed an additional juvenile petition charging defendants with especially aggravated kidnapping, under the incorrect assumption that the Grand Jury could indict defendants only on the offenses for which they were transferred. Although we note the juvenile court judge erred in re-asserting jurisdiction for purposes of the July 3, 1997, transfer hearing, see Tenn. Code Ann. § 37-1-134(c), any issue in this regard is moot since the Grand Jury indicted, and the defendants were convicted on all charged offenses.

upon numerous theories involving ineffective assistance of counsel at various stages of the representation. The trial court conducted a hearing on the amended petition. After hearing the evidence, the trial court issued an order denying the petition for post-conviction relief. Kaess filed a motion to reconsider the trial court's order denying post-conviction relief which the trial court denied. The Petitioner filed a timely notice of appeal.

The following evidence was presented at the post-conviction hearing: The Petitioner's trial counsel, Frank Deslauriers ("Counsel"), testified that he had represented hundreds of criminal defendants from the time he was licensed to practice law in Tennessee in 1986 through the time of the Petitioner's trial in 1997. Counsel, who was the State's only witness in this post-conviction hearing, stated that he was appointed by the trial court to represent the Petitioner. He stated that he initiated plea bargain proceedings, but the State refused to plea bargain. He explained that he was appointed about three months before the trial and that, during that time, he met with the Petitioner three or four times. Counsel explained that he believed both the period of time and the number of times he met with the Petitioner were adequate to prepare for the trial. He also stated that he felt there was no benefit to requesting a continuance.

Counsel acknowledged that, at the time of the trial, he knew the Petitioner was mildly mentally retarded; however, he stated that the Petitioner appeared to understand the seriousness of the charges and expressed concern about going to jail. Counsel testified that the Petitioner was similar to many of the other defendants he represented and that he believed the Petitioner understood the charges against him and the possible consequences if found guilty.

When asked about the statement the Petitioner gave to the police, Counsel explained that the Petitioner's mother was present for the police questioning. He stated that he spoke with her about her recollection of the questioning, and she told him she did not believe the statement was coerced. Counsel testified that he had no recollection of whether the mother thought the Petitioner did not understand the questions because of his mild mental retardation. Counsel stated that, based on his interactions with the Petitioner and reviewing the statement, Petitioner seemed to understand the questions and was able to answer them "with no problem."

Counsel testified that, in preparing for trial, he was able to look at the State's files and to perform discovery. He also stated that prior to the trial he and David Stockton, of the Public Defender's Office, spent a lot of time working on the case. Stockton represented co-defendant Kenneth Adams. Counsel stated that, when he examined the statement given by the co-defendant, the statements were inconsistent.[2] He explained that the statements placed the individuals in the house, "but they all denied they did anything . . . bad to the old man." Counsel explained that the Petitioner's statement was helpful to his defense because it assigned blame to the other individuals and minimized his involvement. When asked why he did not try to suppress the Petitioner's statement, Counsel explained that he initially filed a motion to suppress the statement, but later

---

[2]Police arrested four individuals for the murder of the victim. The Petitioner and co-defendant, Kenneth Adams, were tried together. The other two defendants were tried separately. Police took statements from all four defendants.

withdrew the motion for strategic reasons. Counsel stated that he withdrew the motion because he "didn't think it would be successful, and even more importantly, [Counsel] decided the statement [the Petitioner] gave was about as good as [Counsel] could get from him on the witness stand, and [Counsel] didn't want [the prosecutor] to cross-examine [the Petitioner]." Counsel testified that the evidence against the Petitioner was "at least strong" because police found a footprint in the victim's kitchen matching the Petitioner's shoe, and an eyewitness saw the Petitioner and the three co-defendants walking out of a muddy field after abandoning the victim's car.

Counsel explained that he did not have the Petitioner evaluated regarding his mental capacity because the Petitioner had been evaluated two months before the murder. Counsel testified that he spoke with Dr. Lori Keith, who evaluated the Petitioner prior to the murder, as well as informally speaking with an outside doctor. Counsel stated that, when he spoke with the outside doctor, the doctor did not think there was any benefit to having the Petitioner re-evaluated and that there was nothing the doctor could do to help the defense. Counsel recounted that Dr. Keith's diagnosis of the Petitioner was that he suffered from mild mental retardation and oppositional defiant disorder which, to Counsel's understanding, meant the Petitioner was "mean." Counsel also stated that, in addition to speaking with these two doctors, he spoke with the Petitioner's principal and one of his teachers and examined the Petitioner's school records. He testified that the Petitioner's school records showed that the Petitioner was involved in numerous fights. Counsel testified that, based on these conversations, he did not want any of these people to testify at the trial because they "didn't have a whole lot good to say about his ability to fit in, in any social situation. . . ." Counsel testified that part of his trial strategy was to tell the jury that the Petitioner was mildly retarded and to have the Petitioner tried with his co-defendant, Kenneth Adams. Counsel explained that he wanted the Petitioner "to be the mildly retarded defendant next to, hopefully, the really bad guy, and the jury might cut [the Petitioner] a break because of that."

Counsel admitted to copying Stockton's appellate brief "more or less," having reviewed the brief and the facts of the case. Counsel stated that he felt the brief raised a good issue, namely a double jeopardy problem, which was ultimately unsuccessful. He also stated that he "batt[ed] around a number of [other] issues," including actual transfer of the Petitioner from juvenile court because of the mental retardation. Counsel testified that he determined that there were no other serious issues. He stated that, after examining the facts, he was determined that this was a bad case. Counsel explained that "[t]his was a case in which four young men sat in a house waiting for a 70-year-old man, tied him up, gagged him, threw him in the bathtub, piled furniture on him, with water and kerosene." Counsel testified that he did not think he could convince a jury that the Petitioner did not recognize the inherent danger of placing a man wrapped in a blanked into a bathtub filled with water and kerosene and then piling furniture on top of him.

Counsel explained that, in hindsight, whenever he lost a case, he could always find things that he wished he had done differently, but that it did not mean the outcome would have changed.

When cross-examined, Counsel was asked about Stockton's motion to withdraw from representing both the Petitioner and co-defendant Adams. Counsel stated that the motion submitted

-4-

by Co-counsel cited a conflict of interest as the reason for the motion to withdraw from representing both men. Counsel agreed that Stockton had represented the two defendants for approximately four months prior to the motion to withdraw. Counsel stated that during that time, Stockton filed motions to dismiss the indictment on behalf of both Petitioner and co-defendant Adams because they had been held without bond from the time of their arrests on April 28, 1997, until the date of the motions on July 10, 1997, in violation of their Fifth Amendment and due process rights. The trial court denied these motions.

Counsel explained that while reviewing the Petitioner's Covington Middle School records he found five instances of fighting and approximately 30 disciplinary write-ups. When asked if these behavioral problems could have been related to or caused by the Petitioner's mild mental retardation, Counsel stated that he "took that behavior to be part of [the Petitioner's] oppositional defiant disorder, not his mental retardation."

Counsel stated that he withdrew the motion to suppress the statement given by Petitioner on the morning of the trial. Counsel testified that he spoke with Dr. Keith and that she told him the Petitioner read at a second or third grade level. Counsel explained that after he reviewed the Miranda warnings signed by the Petitioner, he believed that the Petitioner understood his rights. Counsel testified that he thought the Petitioner "understood he didn't have to say anything if he didn't want to." Counsel further testified that, while the Petitioner may not have understood certain abstract ideas, "he understood that if he [told] them something . . . it may come back to hurt him."

Counsel also expressed concern that one of the other three defendants might have pled guilty and testified against the Petitioner.

Counsel explained that his main focus in his argument to the jury was to get a negligent homicide conviction rather than felony murder. Counsel conceded that the victim was a very sympathetic individual. Counsel testified that the reason he did not object to the portrayal of the victim as an elderly man who visited his wife at least twice a week in the nursing home was because he was afraid of jury backlash to his objecting to innocuous questions. Counsel explained that if he objected to these questions, he would have been forced to object to every personal question, when much of the information came in during voir dire. Counsel stated that he did not consider filing a motion in limine to prevent the jury from hearing this testimony.

Counsel testified that, while he wanted the jury to think of the Petitioner as mentally retarded, he did not intend to show that the Petitioner did not understand what was going on. Counsel explained that he wanted to show that the Petitioner was a "follower," with the hope that the jury would find him less responsible. Counsel stated that he did not think he could convince a jury that the Petitioner did not know a man could die from being wrapped in a blanket and then buried in furniture in a bathtub full of water and kerosene. Instead, Counsel explained that he was trying to convince a jury that the Petitioner was not trying to kill the victim, rather he wanted to prevent the

victim from calling the police. Counsel admitted to introducing evidence at the trial that the Petitioner had an IQ of 66 but failing to explain the significance of that evidence.

Counsel was questioned about the Petitioner's pre-sentence report that stated that the Petitioner was on probation at the time of the incident. Counsel testified that he did not have a clear recollection of what was done to determine whether the Petitioner was on probation. The Petitioner's post-conviction attorney argued that this was a clerical error and that Petitioner was not, in fact, on probation at the time of the incident. Counsel stated that he was "pretty sure" that he did not contact the Fayette County Court to determine whether the Petitioner was on probation. The post-conviction court recognized the argument raised that Counsel "didn't investigate [the allegation of Petitioner being on probation] sufficiently by contacting another court, and that what [Counsel] interpreted the records to be was perhaps incorrect." The pre-sentence report stated that the Petitioner was on probation; however, it mistakenly listed co-defendant Adams's case number and record on the Petitioner's report. Accordingly, while co-defendant Adams was on probation at the time of the incident, the Petitioner was not.

Counsel stated that in addition to the mistaken pre-sentence report, another reason for the sentences to run consecutively was because the Petitioner was a "dangerous offender." When asked if he presented any evidence that the Petitioner was not a dangerous offender, Counsel explained that he did not remember, but that he probably put the Petitioner's mother and possibly another family member on the stand to say that the Petitioner was not dangerous.

Counsel stated that he did not remember whether there was any mention of the Petitioner's mental retardation in the appellate brief. He testified that while he used Co-counsel's appellate brief, he did independent research concerning appealable issues and reviewed Co-counsel's brief for accuracy.

The Petitioner produced two witnesses at the hearing, Dr. Ann Phyfer and Co-counsel. Dr. Phyfer testified that she was a psychologist at Timber Springs Adolescent Center with a background in clinical psychology. The parties stipulated that she was an expert. Dr. Phyfer stated that she did not meet with the Petitioner until the night before the post-conviction hearing. She stated that she tested the Petitioner using the Bender Gestalt, a neurological screening test to diagnose organic brain damage, Minnesota Multiphasic Personality Inventory test ("MMPI"), and questions that test abstract thinking. Dr. Phyfer explained that the answers to the questions and some of the Petitioner's questions to her about the various tests led her to conclude that the Petitioner "is a very concrete thinker. He has consistent problems with abstract terms." Dr. Phyfer stated that:

[The Petitioner] understands hope in concrete terms. He can hope for – hope that he'll have pizza for supper or he can hope that he'll get to play basketball tomorrow, but whether he is hopeful, he has difficulty with. And it was that kind of, that level of abstraction where I would find him having trouble comprehending.

The doctor stated that another example of the Petitioner's trouble with abstract terms was his difficulty in understanding the terms like "social," "drive" when meaning ambition, and "human nature." "[The Petitioner] understood specific activities, but it's very hard for him to generalize and then recognize the term again in another form. . . ." Dr. Phyfer testified that the Petitioner's results of the Bender Gestalt test indicated that there was no sign of neurological damage. She stated that the Petitioner's visual and motor perception was excellent. Dr. Phyfer explained that the Petitioner had particular difficulty with double negatives.

Dr. Phyfer testified that her "diagnosis by exclusion" of the Petitioner was that he suffered from an adjustment disorder. She explained that the MMPI test did not indicate that the Petitioner was antisocial, under-socialized or aggressive. She stated the Petitioner was someone who was "quite concerned with the impression he is making, with being accepted by his peers." Furthermore, the doctor testified that the Petitioner did not score high on hostility or anger toward anyone, but rather he had "high levels of empathy and understanding." Dr. Phyfer gave the following diagnosis:

> [The Petitioner is] a person who's concerned with being accepted by his peers, who has some doubts about whether other people are going to like him. And those are typical adolescent concerns. He didn't show any pathology [on the tests]. There's no mental illness and no antisocial personality stuff on the tests.

Dr. Phyfer explained that the Petitioner felt sad most of the time. She stated that his sadness came from his remorse and regret at having caused the victim's death. The doctor testified that the Petitioner thought about the victim's death "pretty much all the time" unless he was given an activity to take his mind off the death. She further testified that the Petitioner had nightmares and night terrors when asleep and had flashbacks during the day about the incident.

When asked if the Petitioner was a dangerous offender, Dr. Phyfer stated that he was dangerous to the extent that he was led by dangerous people. She explained that, because he seeks approval from peers, if he fell under the influence of bad or dangerous people, he may be susceptible to doing bad things again. However, Dr. Phyfer testified that the Petitioner was not a danger in the sense of planning or instigating robberies. Having examined the Petitioner's school records, the doctor stated that, although the Petitioner had been in fights, he had never used weapons, and the idea of harming another person deliberately "was absolutely foreign to him." She also stated that the disciplinary problems indicated his desire to be accepted by his peers by being the class clown. Dr. Phyfer explained that these disciplinary problems were the result of his efforts to make people like him. She also speculated that he might suffer from an attention deficit disorder but, due to his depression, it was hard to be certain.

Dr. Phyfer testified that, while the Petitioner would recognize a knife, gun, or even an instrument that causes blunt trauma as potentially lethal, he would not see the blanket or tape as lethal weapons. She stated that, in his mind, the Petitioner was trying to keep the victim from moving or calling the police, not trying to kill him. Dr. Phyfer admitted that she did not have enough

experience or interaction with the Petitioner, but that, in her opinion, the Petitioner would not see a connection between covering someone with a blanket and his death.

Dr. Phyfer testified that the Petitioner would not understand abstract terms in the Miranda rights waiver form like "constitutional rights." Furthermore, the doctor explained that conditional statements like, "If you do answer questions, your answers can be used as evidence against you in court," "If you cannot afford to hire a lawyer," and "If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time until you talk to a lawyer," were too abstract for the Petitioner to understand. She stated that a conditional statement implies an alternative, which the Petitioner would have been unable to grasp. Dr. Phyfer also explained that the Petitioner would not understand the statement, "You need not answer any question," because of the sentence's structure. Dr. Phyfer stated that "[h]e would understand better, 'You can answer these questions if you want to, but if you don't want to, you don't have to.'" Dr. Phyfer's conclusion was that the Petitioner would not have understood the language or the significance of his rights in a legal context when the police read the Miranda rights to the Petitioner. She stated that, in her opinion, the Petitioner could not have signed the waiver understanding what his rights were and voluntarily waiving them.

On cross-examination, Dr. Phyfer admitted that, other than being mildly retarded, the Petitioner suffered from no mental disease or defect and that he knew the difference between right and wrong. She also admitted that he told her about his participation. She testified that the Petitioner went through the house looking for things to take and that he knew that this behavior was wrong. She further testified that the Petitioner understood that water could cause a person to drown, although she did not believe he understood why he was turning on the water. When shown a photograph of the bathtub and told to assume that under the blanket was a man's head, Dr. Phyfer testified that she believed the Petitioner would see this as "a very, very dangerous thing to do."

Dr. Phyfer explained that, while the school may have diagnosed the Petitioner with an oppositional defiant disorder, it was likely something more severe. She stated that oppositional defiant disorders are usually amenable to behavioral programs which reinforce positive behavior and punish the undesirable behavior. She testified that, in her opinion, the Petitioner suffered from attention deficit hyperactivity disorder or an impulse control disorder.

Dr. Phyfer stated that, while the Petitioner had the physical coordination to tie a knot and to "hog-tie" an individual, he would need directions about how to do it. She explained that the Petitioner "wouldn't be able to think up and carry out that kind of [planned] behavior." When shown a photograph of the victim's hands, Dr. Phyfer testified that she did not think the Petitioner could have bound the hands without someone else modeling the behavior.

On redirect, Dr. Phyfer explained that in general terms, a blanket would not be perceived as lethal if the Petitioner had seen someone wrapped in a blanket with their head covered. She stated that the Petitioner expressed concern about the victim calling the police, and that was why someone put the chest-of-drawers over the bathtub. Dr. Phyfer speculated that:

[B]y the time he was that far involved in the burglary, I don't think [the Petitioner] was listening to what he called earlier his "best voice," his "best mind," and I don't think he was thinking for himself at all at that point, so that he – the capacity for judgment that he would have ordinarily had would have been diminished even more by being there, with those people telling him what to do and rushing around and engaged in their own goal-directed activity, which was not his goal-directed activity.

Stockton testified that he was appointed to represent both the Petitioner and co-defendant Adams in July of 1997. He testified that, about four months later, he filed a motion to withdraw as counsel for the Petitioner in early November of 1997. Stockton stated that, during that time, he did not spend a great deal of time working with either the Petitioner or co-defendant Adams and he had no recollection of meeting with either of them from July 10, 1997, through November 3, 1997.

Stockton explained he filed the motion to withdraw as counsel for the Petitioner when he received some discovery materials that indicated that the State was seeking to enhance the punishment from life sentences with the possibility of parole to life without parole sentences. He stated that, at the sentencing phase, there would be a discrepancy that could be material with regard to the degree of culpability of the Petitioner and co-defendant Adams. Stockton further testified that he did not perceive there being a conflict of interest because the Petitioner was mildly mentally retarded.

Following this evidence, the trial court denied the Petitioner's petition for post-conviction relief. The trial court found that:

> [The] petitioner has failed to establish the factual allegations contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-210. The petitioner has not shown that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial. The petitioner has not shown that the services rendered or the advice given was below the range of competence demanded of attorneys in criminal cases. The petitioner has not shown that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203 (1997). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject

to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. U.S. CONST. amend. VI.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance of counsel. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

On appeal, the Petitioner argues that the post-conviction court erred by finding that the Petitioner was not denied effective assistance of counsel. Specifically, the Petitioner makes the following arguments:

1. He was denied effective assistance of counsel because (1) his trial attorney failed to move to remand the case to Juvenile Court since the trial court lacked jurisdiction: the Defendant's constitutional rights were violated in the transfer hearing; and (2) his trial attorney failed to demonstrate, on direct appeal, that the Juvenile Court should not have transferred the child's case.

2.    He was denied effective assistance of counsel because his trial attorney failed to move to disqualify Co-counsel, who had represented both co-defendants, but withdrew because of a conflict of interest.

3.    He was denied effective assistance of counsel because his trial attorney failed to adequately investigate the case and failed to adequately develop his trial strategy.

4.    He was denied effective assistance of counsel at trial because his attorney failed to object to three inaccurate jury instructions and failed to raise the errors on appeal.

5.    He was denied effective assistance of counsel in his sentencing hearing because his trial attorney failed to demonstrate that his sentences should run concurrent, not consecutive.

6.    He was denied an attorney to represent him on appeal; or in the alternative, he was denied effective assistance of counsel on appeal.

We disagree with these assertions.

## A.  Transfer from Juvenile Court

The Petitioner alleges that Counsel was ineffective for failing to move to remand the case to juvenile court, and for failing to raise this issue on appeal.  The juvenile court has exclusive original jurisdiction over children alleged to be delinquent. Tenn. Code Ann. § 37-1-103(a)(1) (1996).  The juvenile court may transfer jurisdiction to a criminal court for trial as an adult upon petition, notice and a hearing. Tenn. Code Ann. § 37-1-134(a) (1996).  Such a transfer "terminates the jurisdiction of the juvenile court over the child with respect to the delinquent acts alleged."  Tenn. Code Ann. § 37-1-134(c).  There is no interlocutory appeal from the judgment of the juvenile court if it transfers the child to a criminal court. Tenn. Code Ann. § 37-1-159(d) (1996).

### 1.  Failure to File Motion to Remand to Juvenile Court

Counsel was appointed for the Petitioner on November 3, 1997.  The State filed a petition to remove the case from juvenile court and have it transferred to circuit court, and the juvenile court transferred the case after the transfer hearing held on June 3, 1997.  At the time Counsel was appointed, the Petitioner's case was already transferred to the circuit court, and he had been indicted by a grand jury.  Counsel did not have any grounds under state law to appeal the transfer at the time he was appointed. Tenn. Code Ann. § 37-1-159(d).

Counsel's only avenue for relief was on appeal, and this issue was not raised on direct appeal. The post-conviction court found that:

-11-

[W]hen the [Petitioner] was indicted the issues with regard to juvenile court were no longer viable. There was no legal basis presented at the hearing on the motion for post conviction relief for the remand to juvenile court. The Court of Criminal Appeals considered the issues raised with regard to the actions of the juvenile court, and other actions are waived for not being presented. T.C.A. 40-30-206(g).

The State contends that the Petitioner waived this issue by not adequately briefing the issue. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See also Tenn. R. App. P. 27(a)(7).

The Petitioner's brief alleges that Rickey W. Griggs, the public defender who represented the Petitioner and co-defendant Adams at the transfer hearing, provided ineffective assistance of counsel on several grounds including: representing both individuals when there was a conflict of interest in representing both individuals at the transfer hearing; failing to object to the admission of the co-defendant's statement at the transfer hearing; failing to file a motion to sever; and failing to object to co-defendant's statement on hearsay grounds.

The Petitioner fails to cite to any authority or references to the record to support these allegations and the Petitioner failed to introduce evidence to bolster this claim at the post-conviction hearing. The Petitioner's argument is simply an assertion with no supporting evidence. Therefore, we conclude that the Defendant has waived this issue.

## 2. Challenge of Transfer from Juvenile Court on Direct Appeal

The Petitioner also alleges that Counsel was ineffective for failing to challenge the transfer from juvenile court on direct appeal. The Petitioner asserts that, had his statement been suppressed at the transfer hearing, he would have been successful in keeping the case before the juvenile court. This allegation is based on the Petitioner's claim that the statement given to the police should have been suppressed on the grounds that the Petitioner's statement was not voluntarily and intelligently given due to his mental retardation. Griggs made an oral motion to suppress the statement at the time it was read by Special Agent Bieber at the transfer hearing. The motion was denied. After Agent Bieber read the statement, Griggs moved to suppress the statement. This motion was also denied.

To prevail on a claim of ineffective assistance of counsel, the Petitioner must show that Counsel's "representation fell below an objective standard of reasonableness," and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Strickland, 466 U.S. at 687-88; Cooper, 849 S.W.2d at 747. The post-conviction court found that: (1) the Petitioner failed to show that, but for Griggs' unreasonable error, the juvenile court judge at the transfer hearing would have denied the State's motion to transfer the Petitioner's case from juvenile court to the circuit court; (2) the Petitioner failed to prove that, had Griggs moved to suppress his statement, he would have been successful at keeping the case before the juvenile court; and (3) the

-12-

Petitioner failed to show that he would have prevailed had Counsel raised the issue concerning the transfer hearing on appeal.

The juvenile court transferred jurisdiction to the circuit criminal court after it provided the Petitioner with notice and a hearing. Tenn. Code Ann. § 37-1-134(a) (1996). At the hearing, the juvenile court judge stated that "a jury should decide the case. . . ." The judge made this determination "based on the heinous nature of the crime, the fact that they are repeat offenders, [and] the fact that apparently after the incident occurred there was little or no remorse. . . ." The judge stated that he did not believe that possible rehabilitation through procedures and services available through the juvenile court were appropriate in a first-degree murder case, which conflicts with the statute; however, the Petitioner has failed to show prejudice. The judge cited to other factors weighing in favor of transferring the case to the circuit court. The transfer terminated the jurisdiction of the juvenile court over the Petitioner with respect to the delinquent acts alleged. Tenn. Code Ann. § 37-1-134(c). Accordingly, because the juvenile court based its determination to transfer the case on multiple factors, none of those being related to the Petitioner's statement, we conclude that the evidence does not preponderate against the post-conviction court's finding that Counsel's failure to move to remand the case to juvenile court and his failure to raise this issue on appeal does not warrant post-conviction relief.

### B. Failure to Move to Disqualify Co-counsel because of Conflict of Interest

The Petitioner alleges that Counsel was ineffective for failing to move to disqualify Co-counsel because Co-counsel initially represented both the Petitioner and co-defendant Adams. Co-counsel was appointed to represent the Petitioner and co-defendant Adams on July 10, 1997. Co-counsel testified that he filed a motion to withdraw as counsel for the Petitioner on November 3, 1997, when he received notice from the State that it might seek life without possibility of parole. He explained that he became concerned that there would be questions of culpability at the sentencing hearing and that he could not continue representing both the Petitioner and co-defendant Adams. Co-counsel further testified that, between July 10, 1997, and November 3, 1997, he spent little time with either the Petitioner or the co-defendant, and that, in fact, he had no recollection of meeting with them during that time and had no notes in his files from that period. Co-counsel testified that he continued to represent the co-defendant during the trial and throughout the appeals process.

To satisfy the requirement of prejudice, the Petitioner must show a reasonable probability that he was prejudiced by Counsel's failure to move to disqualify Co-counsel as counsel for co-defendant Adams. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris, 875 S.W.2d at 665. Further, the Petitioner must show that but for Counsel's unreasonable error, the jury would have reached a different finding regarding the Petitioner's guilt. Strickland, 466 U.S. at 687. The Petitioner has failed to show that he was prejudiced by Co-counsel's continued representation of his co-defendant.

The Petitioner cites to the circuit court judge's statement that "in a case like this I probably should have appointed separate attorneys from the very beginning" to support the assertion that Co-

-13-

counsel's representation of co-defendant Adams was prejudicial to the Petitioner. However, Co-counsel testified at the post-conviction hearing that he did not initially foresee any conflict between the Petitioner and co-defendant Adams, which is contrary to the Petitioner's assertion. He stated that he first thought there may be a conflict when he "received some discovery materials from the State that indicated that in the event that the matter [went] to trial and the State was seeking to enhance the punishment from the level of a life sentence up to life without parole. . . ." He testified that he thought there may be a conflict of interest at the sentencing phase because there might be a "material" discrepancy with regard to the degree of culpability regarding the Petitioner and co-defendant Adams. The Petitioner attempts to undermine Co-counsel's testimony by citing Wood v. Georgia, 450 U.S. 261 (1981), for the proposition that an attorney is unlikely to admit that "he had continued improperly to act as counsel." Wood, 450 U.S. at 265, n.5. The Petitioner's reliance on Wood is misplaced.

The attorney in Wood was being paid by an interested third-party to represent the individuals at trial and on appeal. The individuals in Wood were charged with selling indecent material while working at an adult theater and bookstore. The owner of the theater had promised to pay any fines, legal fees, and post any bonds necessary if they faced legal troubles as a result of their employment. The Supreme Court recognized that the attorney might be unable to represent the best interests of the employees whose legal fees were being paid by the employer. There was a concern that what was in the best interest of the defendants might not be in the best interest of the employer, who was paying the legal fees. As a result of this potential conflict of interest, the attorney might be unwilling to admit he acted improperly. In the case before us, Stockton's conflict of interest did not arise as a result of the source of either the Petitioner's or Adams' legal fees. Co-counsel is an employee of the State and would not have the same inherent conflict arising from the source of his salary and those he represents. Furthermore, Co-counsel recognized a potential conflict of interest affecting the sentencing phase and requested to be removed as counsel prior to the trial and prior to any meetings with either Petitioner or co-defendant.

Lastly, the Petitioner argues that Counsel should have moved to disqualify Co-counsel because of an appearance of impropriety. The Petitioner fails to cite to the record, and nothing in the transcript indicates that the jury knew that Co-counsel represented both the Petitioner and co-defendant Adams prior to the trial. Co-counsel testified at the post-conviction hearing that his concern about the conflict of interest involved the State's notification that it would seek a sentence of life without possibility of parole. However, the State did not seek this sentence, eliminating the potential conflict of interest. The post-conviction court found that:

> [Co-counsel], counsel for a co-defendant Adams, represented both [the Petitioner] and the co-defendant Adams at one point. He was relieved and [Counsel] was appointed to represent [the Petitioner], upon motion being filed, and it appeared that the case would be tried. It is alleged that [Counsel] should have objected to [Co-counsel] continuing to represent co-defendant. However, [the Petitioner] fails to show how he is prejudiced by [Co-counsel] continuing to represent a co-defendant. Even if he had objected, there was little likelihood that [Co-counsel] would have

-14-

been relieved absent a showing of harmful conflict. [The Petitioner] has failed to demonstrate prejudice.

We agree with the post-conviction court that the Petitioner failed to meet his burden of proving that his trial's outcome would have been different had Co-counsel, who represented co-defendant Adams, been disqualified, or that he was prejudiced by Co-counsel representing the co-defendant. Absent the Petitioner's showing a harmful conflict, there is little likelihood that Co-counsel would have been relieved, and no evidence was presented at the post-conviction hearing to support a showing a of harmful conflict. Accordingly, we conclude that the Petitioner failed to show how he was prejudiced by Counsel's failure to file a motion to disqualify Co-counsel. The Petitioner is not entitled to post-conviction relief on this issue.

### C. Failure to Investigate and Adequately Develop Trial Strategy

The Petitioner alleges that Counsel failed to adequately investigate the case and failed to adequately develop his trial strategy. The Petitioner argues that Counsel was ineffective when he withdrew the motion to suppress the Petitioner's statement; when he failed to file a motion to sever the trials of the Petitioner and co-defendant Adams; and by failing to adequately investigate the case. The evidence shows that Counsel developed a theory of the case and constructed his trial strategy accordingly. Counsel testified that the facts were "bad facts." Counsel also testified that the victim was a sympathetic victim, and the State had forensic evidence of a footprint in the victim's kitchen matching the Petitioner's shoe and an eyewitness who saw the Petitioner and the three co-defendants walking out of the muddy field after abandoning the victim's car. Counsel explained that, faced with these facts, he believed the Petitioner's only chance was to acknowledge his presence in the victim's house but to portray him as a mentally retarded individual who was a "follower," with the hope that the jury would find the Petitioner less responsible.

Counsel testified that he initially filed a motion to suppress the Petitioner's statement to the police but withdrew the motion prior to the trial. He explained that, rather than put the Petitioner on the stand and subject him to cross-examination by the district attorney, he thought it was better to allow the somewhat self-serving statement into evidence. Counsel further explained that the statement was somewhat beneficial to the Petitioner's position that he had little involvement in the crimes. Lastly, Counsel stated that he did not believe the motion would have been successful because the motion had previously been presented to the juvenile court unsuccessfully, and because the Petitioner's mother was present at the time the statement was given.

Counsel testified that he did not think a jury could be convinced that the Petitioner did not recognize the inherent danger of placing a man wrapped in a blanked into a bathtub filled with water and kerosene and then piling furniture on top of him. Rather than risk alienating the jury by presenting this argument, Counsel decided the best strategy was to minimize the Petitioner's involvement. He stated that the Petitioner's statement to the police was the best method to present the Petitioner's side of the story without subjecting him to cross-examination, and that the statement shifted the responsibility of what happened to the others involved.

The Petitioner also alleges that Counsel was ineffective because he failed to file a motion to sever the trials of the Petitioner and co-defendant Adams. Counsel stated that he did not file a motion to sever the Petitioner's trial and co-defendant Adams's trial as part of the trial strategy. Counsel explained that, because the strategy involved making the Petitioner look like a follower, he believed it was necessary to have someone sitting next to the Petitioner at the trial. Counsel explained that, by not severing the trials, the Petitioner sat next to someone that the jury could have thought was a "really bad guy." He testified that the strategy was to have the Petitioner presented as a mentally retarded individual who followed some bad people and made a mistake, with the hope that the jury would "cut [the Petitioner] a break."

We conclude that Counsel's trial strategy of attempting to present the Petitioner as less culpable, withdrawing the motion to suppress the Petitioner's statement, and not filing a motion to sever the trials of the Petitioner and co-defendant Adams, "falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel admitted that, in hindsight, he wished he had done some things differently and he may have changed his trial strategy, but he did not know what he would have done differently. Furthermore, he was unconvinced any changes would have made an impact on the verdict. In the midst of a first-degree murder trial, Counsel made a well-reasoned judgment call regarding how to present the Petitioner to the jury. We will not deem Counsel to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams, 599 S.W.2d at 279-80. Furthermore, the Petitioner has failed to prove that Counsel's performance prejudiced his defense, resulting in a failure to produce a reliable result. Strickland, 466 U.S. at 687; Cooper, 849 S.W.2d at 747. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### D. Failure to Object to Inaccurate Jury Instructions or to Raise Errors on Appeal

The Petitioner alleges that Counsel failed to object to the jury instruction on criminal responsibility. Petitioner further alleges that Counsel was deficient for failing to object to the trial court's failure to instruct the jury on the natural and probable consequences rule. Lastly, the Petitioner alleges that Counsel was ineffective for failing to object to the jury instructions on first-degree murder and felony murder. We conclude that none of these issues entitle the Petitioner to relief.

### 1. Criminal Responsibility and Natural and Probable Consequences

The Petitioner alleges that Counsel was ineffective for failing to object to the trial court's failure to instruct on the natural and probable consequences rule and how it relates to the criminal responsibility of another. The Petitioner relies on State v. Carson, 950 S.W.2d 951 (Tenn. 1997), and State v. Howard, 30 S.W.3d 271 (Tenn. 2000), for the proposition that Counsel was ineffective for failing to object to the jury instruction for the criminal conduct of the co-defendant. The Petitioner's reliance on Howard is improper because Howard was not filed by the Tennessee Supreme Court until July 6, 2000, and the case before us was tried in March of 1998 and the

Petitioner's appeal was denied in December of 1999. Since <u>Howard</u> does not apply retroactively, it is not applicable here.

  <u>Carson</u> is distinguishable from the case before us. In <u>Carson</u>, the defendant, who planned the store robbery, furnished guns and inside information to his co-defendants but waited in the car outside the store, and was convicted of aggravated robbery, aggravated assault, and felony reckless endangerment. <u>Carson</u>, 950 S.W.2d at 952. The Supreme Court concluded that:

> [T]he defendant was criminally responsible for the acts of his co-defendants under Tenn. Code Ann. § 39-11-402(2) because . . . the common law rule (that a defendant who aids and abets a co-defendant in the commission of a criminal act is liable not only for that crime but also for any other crime committed by the co-defendant as a natural and probable consequence of the crime originally aided and abetted) is applicable under the statute.

<u>Id.</u> The Court affirmed the conviction.

  The "natural and probable consequences" rule underlies the doctrine of criminal responsibility and is based on the determination that aiders or abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion. <u>Id.</u> at 954-55. In order for the State to impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible under Tenn. Code Ann. § 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime. <u>Id.</u> The Court found that Tennessee Code Annotated section 39-11-402(2), which states that one may be criminally responsible if he or she "solicits, directs, aids or attempts to aid another person to commit [an] offense," is derived from common law. The Court concluded that, in accordance with the "natural and probable consequences rule" applied under Tennessee Code Annotated sections 39-11-401 and 402, "the evidence was sufficient to find that the defendant, having directed and aided in the aggravated robbery with the intent to promote or benefit from its commission, was criminally responsible for all of the offenses committed by his co-defendants. . . ." <u>Carson</u>, 950 S.W.2d at 956.

  This case is factually different from <u>Carson</u>. In this case, the facts show that four individuals acted in concert. Co-defendant Adams and [the Petitioner], along with two adult co-defendants, entered the 71-year-old victim's home with the intent to steal a large amount of money rumored to be kept in the house. Unsuccessful in finding the money, they sat down to watch basketball and waited for the victim's return. When the victim returned home, the four co-defendants ambushed him in the kitchen. The adults bound the victim's hands and feet with coat hangers and duct tape. Then, he was placed in the bathtub, which the Petitioner had filled with water and kerosene. Before leaving, they covered the victim with various blankets, drapes, and pieces of furniture. The victim died of asphyxia.

The co-defendants took twenty dollars from the victim's wallet, a kerosene space heater, and the victim's car. They spent the afternoon driving around in the victim's car, eating snacks purchased with the victim's money. They abandoned the car in a muddy field after getting stuck and hitchhiked back home. In Carson the defendant was waiting in the car. In this case, the Petitioner was actively involved with three other defendants in tying the victim and putting him in a bathtub filled with water and kerosene.

The Petitioner maintains that death is not a natural and probable consequence of the acts of the four defendants tying and binding the victim, rather the Petitioner contends that the victim died because of his age and other health problems unrelated to being tied, bound, and placed in the bathtub. The trial court determined that the death of the victim was a natural and probable consequence of the acts of the Petitioner and his co-defendants.

While the Petitioner argued that he did not intend the death of the victim, the trial court found that death was undoubtedly a natural and probable cause of wrapping an elderly man in a blanket, placing him in a bathtub filled with water and kerosene, and then placing furniture on top of him to prevent him from getting out of the bathtub. Even if the Petitioner did not intend to kill the victim, the result was a natural and probable result. On cross-examination, Dr. Phyfer admitted that the Petitioner told her about his participation in the robbery. She testified that the Petitioner knew what he was doing was wrong. She further testified that the Petitioner understood that water could be dangerous and that the Petitioner would recognize wrapping an individual in a blanket, placing him in a bathtub filled with water and kerosene, and then placing items on top of him to prevent the individual's escape as "a very, very dangerous thing to do." The Petitioner failed to meet his burden of proving his allegation by clear and convincing evidence of ineffective assistance of counsel for failing to object to the trial court's failure to instruct on the natural and probable consequences rule. The Petitioner admitted being present and, at the very least, filling the bathtub with water, even if at the time he did not know why he was doing it. His admission was sufficient for a jury to find him responsible for the victim's death. Accordingly, the Petitioner is not entitled to post-conviction relief on this issue.

## 2. First-Degree Murder and Felony Murder

The Petitioner alleges that Counsel was ineffective for failing to object to the jury instructions on first-degree murder and felony murder. The Petitioner failed to raise the issue of the jury instructions on first-degree murder and felony murder in his petition for post-conviction relief or at the post-conviction hearing. Issues not presented in the post-conviction petition may not be raised for the first time on appeal. Cone v. State, 747 S.W.2d 353, 356 (Tenn. Crim. App. 1987). Accordingly, the allegation of ineffective assistance of counsel for failing to object to the jury instruction on first-degree murder and felony murder is waived.

## E. Failure to Demonstrate Sentences Should Run Concurrently

The Petitioner alleges that Counsel was ineffective for failing to demonstrate that his sentences should have run concurrently rather than consecutively. We find this issue to be without merit. At the sentencing hearing, the trial court sentenced the Petitioner to serve his sentences for first-degree murder, felony murder, aggravated robbery and especially aggravated kidnapping consecutively because it found that he was both on probation at the time he committed these crimes *and* that he was a dangerous offender.

At the post-conviction hearing, the Petitioner argued that there was a clerical error and he was not, in fact, on probation at the time of the incident. The pre-sentence report indicated that the Petitioner was on probation; however, it mistakenly listed co-defendant Adams's case number and record in the Petitioner's report. Accordingly, while co-defendant Adams was on probation at the time of the incident, the record lacks evidence that the Petitioner was on probation at the time of the incident. While the State is willing to concede that there was a clerical error and that the Petitioner was not on probation at the time of the incident, the Petitioner still must prove that the trial court erred when it found the Petitioner to be a dangerous offender.

Dr. Phyfer testified that the Petitioner was not a dangerous offender in the sense that he was unlikely to plan or instigate robberies. However, Dr. Phyfer testified that the Petitioner was a dangerous offender to the extent that he was led by dangerous people. She explained that, because he seeks approval from peers, if he fell under the influence of bad or dangerous people, he may be susceptible to doing bad things again. She further testified, that after reviewing the Petitioner's school records, she concluded that although the Petitioner had been in fights, he had never used weapons, and the idea of deliberately harming another person "was absolutely foreign to him." She explained that the Petitioner's disciplinary problems were the result of his efforts to make people like him.

Dr. Phyfer testified that the Petitioner told her about his participation in the incident. She stated that he knew the difference between right and wrong, and that, while in his mind he was trying to keep the victim from calling the police and not trying to kill him, the Petitioner would see wrapping someone in a blanket and then placing the person in a bathtub filled with water and kerosene as "a very, very dangerous thing to do."

Dr. Phyfer speculated that, by the time the victim was placed in the bathtub and wrapped in the blanket, the Petitioner was so far involved in the robbery, he was not listening to his "best voice," and, in her opinion, the Petitioner was not thinking for himself at all. She explained that the Petitioner's ordinary capacity for judgment was likely diminished even more by being in the victim's house with other people telling him what to do.

While Dr. Phyfer's testimony was unavailable to the trial court at the time of the sentencing, it is unclear that her testimony would have benefitted the Petitioner's position. Dr. Phyfer stated that the Petitioner, while not an obviously dangerous offender, had the potential to be one if he followed the wrong people. Furthermore, she stated that the Petitioner admitted to being at the home of the

victim, participating in the burglary, and understanding the difference between right and wrong. The trial court held that:

> Petitioner alleges that [Counsel] was ineffective at sentencing by failing to object to consecutive sentencing, and failed to show that defendant was not a dangerous offender.
>
> The state did not pursue life without parole at the trial. Therefore, the only sentence for the murder conviction was life.
>
> [Counsel] went over the pre-sentence report with his client, and stipulated to its admission. Petitioner now claims that there was an error in the report, which stated he was on probation at the time of the offense.
>
> Petitioner received the presumptive sentence of 8 years for aggravated robbery, and the presumptive sentence of 15 years for especially aggravated kidnapping, concurrent, but consecutive to the life sentence.
>
> The Court used two factors under T.C.A. 40-35-115 to impose consecutive sentencing. Therefore, even if in error about the factor that the offense was committed while on probation, the consecutive sentencing would still be imposed on the fact that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and who committed a crime in which the risk to human life is high. The Court found that an extended sentence was necessary to protect the public and that consecutive sentences reasonably relate to the severity of the offenses that were committed.
>
> The Court finds that petitioner has failed to satisfy his burden of showing that his counsel was deficient for failing to discover the error in the pre-sentence report, or that his failure to do so prejudiced the outcome of the sentencing. The petitioner is not entitled to post-conviction relief on this issue.

The trial court articulated its finding that the Petitioner was "a dangerous offender whose behavior indicates little or no regard for human life, and who committed a crime in which the risk to human life is high." The testimony by Dr. Phyfer does not contradict this finding. The Petitioner failed to meet his burden of proving his allegation by clear and convincing evidence. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### F. Denied Effective Assistance of Counsel on Appeal

The Petitioner alleges that Counsel provided ineffective assistance of counsel during his appeal. Petitioner bases this allegation on the fact that Counsel copied the co-defendant's brief and, as a result, failed to raise other issues on appeal. The trial court found that:

It is counsel's responsibility to determine the issues to present on appeal. State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986). This responsibility addresses itself to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). There is no constitutional requirement that every conceivable issue be raised on appeal. Campbell v. State, 904 S.W.2d 594, 597 (Tenn. 1995). The determination of which issues to raise is a tactical or strategic choice. Id.

Petitioner has failed to show how copying the brief of co-counsel was prejudicial. [Counsel] testified that he and [Co-counsel] worked together on the case, and collaborated on the appeal. [Counsel] was satisfied that the main issues were presented on appeal. This was a tactical choice.

The Court finds that petitioner has failed to satisfy his burden of showing that his counsel was deficient for failing to brief additional issues, or that his failure to do so prejudiced the outcome of the appeal. The petitioner is not entitled to post-conviction relief on this issue.

The Petitioner alleges that Counsel merely copied the co-defendant's brief, however, Counsel testified at the post-conviction hearing that that was not the case. Counsel explained that while he copied the brief, he did do research. He explained:

I don't mean I just copied [co-counsel's brief] without reviewing anything and doing the research. That's not correct. I used his hard copy, but I just didn't blindly put things in my brief. I thought that issue on double jeopardy argument was a good issue, because if it was successful [the Petitioner] would walk. But, yes, I did do research.

While the Petitioner alleges that Counsel failed to research issues for appeal, Counsel testified to the contrary at the post-conviction hearing. He testified that he researched possible issues and that he ended up copying the co-defendant's brief after he reached the conclusion that the double jeopardy issue "was really the best appellate issue [the Petitioner] had." We conclude that the Petitioner has failed to show that Counsel's representation at the appellate level was deficient.

Even if Counsel's representation were deficient, however, the Petitioner has failed to show prejudice. To prevail on a claim of ineffective assistance of counsel, the Petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper, 849 S.W.2d at 747. To satisfy the requirement of prejudice, the Petitioner must show a reasonable probability that, had Counsel raised certain issues on appeal, the appellate court would have granted a new trial or the outcome would have been different. This reasonable probability must be "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at

694; <u>see</u> <u>also</u> <u>Harris</u>, 875 S.W.2d at 665.  The Petitioner has failed to satisfy this burden. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### III.  Conclusion

Thus, we conclude that the post-conviction court properly found that the Petitioner failed to prove ineffective assistance of counsel by clear and convincing evidence and that Counsel fully discharged his duties as the Petitioner's attorney.  Accordingly, the judgment of the post-conviction court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE